**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
(Charlotte Division)**

_____

COURTNEY D. STEPHENSON )
)
                Plaintiff,    )
)
v.                             )
)
CAROLINAS PHYSICIANS           )
NETWORK, INC., ATRIUM          )
HEALTH, INC., THE CHARLOTTE-   )
MECKLENBURG HOSPITAL           )
AUTHORITY,                     )
)
                Defendants.    )
_____)

Case No.  3:21-cv-103

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Courtney D. Stephenson ("Plaintiff" or "Dr. Stephenson") brings this action against Defendants Carolinas Physicians Network, Inc., d/b/a Carolinas Healthcare System Medical Group, Atrium Health, Inc., and The Charlotte-Mecklenburg Hospital Authority (collectively, "Atrium" or "Defendants"), and alleges as follows:

## NATURE OF ACTION

1.     This action seeks to remedy violations of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601, _et seq._, to redress issues of interference and retaliation related to Dr. Stephenson's requests for and taking of protected family medical leave.

2.     In addition, Plaintiff asserts claims under North Carolina law for breach of contract, breach of the covenant of good faith and fair dealing, negligent infliction of emotional distress, and intentional infliction of emotional distress.

3.     Dr. Stephenson began working for Atrium as a Maternal-fetal Medicine ("MFM") doctor in 2004.  MFM doctors are obstetricians with advanced training to monitor and care for mothers and their babies during high-risk pregnancies. Dr. Stephenson was the sole fetal surgeon and head of Atrium's prestigious Charlotte Fetal Care Center ("CFCC") from 2010 until her wrongful termination in 2019.  During her impressive tenure, Dr. Stephenson's work was highly touted by Atrium, and she received numerous awards and accolades for her life-saving fetal surgeries.

4.     Within minutes of requesting FMLA leave to care for her ill teenage daughter, Dr. Stephenson was highly discouraged from taking such leave.  Being a single mother, she had no choice but to take the leave to which she was entitled under the FMLA, despite concerns for her job. Atrium begrudgingly granted her request. Dr. Stephenson's continuous FMLA leave ran from June 6, 2019, to July 6, 2019. Dr. Stephenson's leave, however, was repeatedly disrupted by Atrium. Dr. Stephenson also took intermittent FMLA leave from July 7, 2019, which was supposed to run through the end of that year.

5.     Despite her prior success at work, during both her continuous and intermittent leave, Dr. Stephenson began to experience a barrage of retaliatory action against her, including the repeated questioning of her medical judgment. She had never been the subject of a quality action, a query regarding patient care that results in an investigation, before taking FMLA leave. Suddenly, both during and immediately following her FMLA leave, Dr. Stephenson was subjected to two quality actions, both of which arose from her performance of lifesaving fetal surgeries that resulted in positive outcomes to the babies and mothers.  Prior to taking FMLA leave, Dr. Stephenson's clinical

2

care and judgment had never been questioned or subjected to anything other than praise from Atrium.

6.     The retaliatory treatment continued to escalate throughout her intermittent FMLA leave period. Dr. Stephenson was unreasonably stripped of her hospital privileges during the quality action investigations, was humiliated by being required to sit in her office without being permitted to do any work and was subjected to heightened, disparate scrutiny in essentially every move she made at work. Ultimately, Dr. Stephenson was unlawfully terminated on November 8, 2019.

7.     The purported reasons for taking these actions – including terminating Dr. Stephenson – were merely pretext for its discriminatory and retaliatory treatment of Dr. Stephenson. These adverse actions were the direct result of Dr. Stephenson's request for and use of FMLA leave. Atrium's actions violated federal law, and subjected Dr. Stephenson to severe emotional distress.

## PARTIES

8.     **Plaintiff Courtney Stephenson** is a citizen and resident of the State of North Carolina.  Dr. Stephenson began working for Atrium in 2004 as an MFM doctor. She served in several leadership positions within the department, including as Director of Fetal Intervention Program at the CFCC from its opening in 2010 until her wrongful termination on November 8, 2019. Dr. Stephenson was an "eligible employee" within the meaning of 29 U.S.C. § 2611(2)(a)(i).

9. **Defendant Carolinas Physicians Network, Inc. d/b/a Carolinas Healthcare System Medical Group ("CPN")** is a corporation duly organized according to and/or existing under and pursuant to the laws of the State of North Carolina, with its principal office and place of business located at 1000 Blythe Boulevard, Charlotte, Mecklenburg County, North Carolina 28203. CPN is an "employer" within the meaning of 29 U.S.C. §§ 2611(4)(a)(i).

10. **Defendant Atrium Health, Inc. ("Atrium Health")** is a corporation duly organized according to and/or existing under and pursuant to the laws of the State of North Carolina, with its principal office and place of business located at 1000 Blythe Boulevard, Charlotte, Mecklenburg County, North Carolina 28203. Atrium operates hospitals and over 1,000 care centers and clinics.  Atrium Health, Inc. is an "employer" within the meaning of 29 U.S.C. §§ 2611(4)(a)(i).

11. **Defendant The Charlotte-Mecklenburg Hospital Authority** ("CMHA") is a corporation duly organized according to and/or existing under and pursuant to the laws of the State of North Carolina, with its principal office and place of business located at 1111 Metropolitan Avenue, Suite 600, Charlotte, Mecklenburg County, North Carolina 28204. CMHA employs physicians, nurses and other healthcare providers and offers medical services.

12. Defendants CPN, Atrium Health and CMHA are referred to collectively herein as "Atrium" or "Defendants." Defendants jointly employed Dr. Stephenson.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is an action based on FMLA interference in violation of 29 U.S.C. § 2615(a)(1) **(Count I)** and employer retaliation in violation of 29 U.S.C. § 2611(c) **(Count II).**

14.     This Court has supplemental jurisdiction over Plaintiff's state common law claims for breach of contract **(Count III)**, breach of the covenant of good faith and fair dealing **(Count IV)**, negligent infliction of emotional distress **(Count V)** and intentional infliction of emotional distress **(Count VI)**.

15.     Defendants are subject to the personal jurisdiction of this Court as North Carolina corporations, each with their principal place of business in Charlotte, Mecklenburg County, North Carolina, which is within this judicial district. Atrium Defendants are present in and regularly conduct affairs and business activities in this judicial district and engaged in the conduct that is the subject of this lawsuit within this judicial district.

16.     At all times relevant to this action, Dr. Stephenson was employed by Atrium in this judicial district, namely in Mecklenburg County, North Carolina. This judicial district is where Plaintiff worked for Atrium and where Plaintiff would have continued to work but for Defendants' unlawful employment practices and conduct.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 42 U.S.C. § 2000e-5(f)(3) because the unlawful conduct of which Plaintiff complains is alleged to have been committed in this judicial district.

18.     Venue in this Court is also proper pursuant to 28 U.S.C. § 1391(b)(1) because Defendants each reside or have their principal place of business in this judicial district.

## FACTUAL ALLEGATIONS

### Dr. Stephenson's Professional Career

19.     After graduating from medical school in 1997, Dr. Stephenson trained as a resident in Obstetrics and Gynecology at New York-Presbyterian Brooklyn Methodist Hospital. She then completed a fellowship in Maternal-fetal Medicine at New York University School of Medicine in 2004. Following her training, she was hired as an MFM Faculty Attending Physician at Atrium. She worked there for more than 15 years, until her unlawful termination on November 8, 2019.

20.     From 2004 to approximately 2008, Dr. Stephenson served as an Assistant Director of Maternal-fetal Medicine at Atrium. From 2008-2015 and 2016-2018, Dr. Stephenson served as an Associate Director of Maternal-fetal Medicine at Atrium. From 2015-2016, she served as the Interim Director of Maternal-fetal Medicine. From 2018 until her termination, Dr. Stephenson was also a Full Professor of Obstetrics and Gynecology at Atrium. In addition to her positions at Atrium, Dr. Stephenson also received an academic appointment at the University of North Carolina, where she has served as a Clinical Professor since 2008.

21.     During her tenure at Atrium, Dr. Stephenson independently sought out training in the highly specialized field of fetal intervention (intrauterine fetal surgery). On her own accord and during her personal time off, Dr. Stephenson traveled to Cincinnati to train at the Cincinnati Children's Hospital Medical Center as a Visiting Surgeon in the

6

Department of Pediatrics, so that she could become proficient in intrauterine surgical interventions for fetal issues. By 2010, she was the only fetal surgeon in the state of North Carolina.

22.     Beginning in 2008, Dr. Stephenson founded and worked to fund the CFCC, the only fetal care center in the Southeast United States that fetoscopically treats Twin-Twin Transfusion syndrome. The CFCC was part of the Atrium network. She was the first woman to open a new fetal surgery center. From its opening in 2010 until she was terminated, Dr. Stephenson served as the Director of the Fetal Intervention Program at the CFCC.

23.     Patients from across the Southeast traveled to the CFCC to consult with Dr. Stephenson. She was able to perform innovative surgeries that provided the only interventional option other than pregnancy termination. She saved the lives of countless babies.

### Dr. Stephenson's Request for FMLA Leave

24.     In addition to being a widely-renowned and sought-after surgeon, Dr. Stephenson is a single mother caring for two children. In May of 2019, Dr. Stephenson became aware that her minor daughter suffered a relapse of a condition which, according to her daughter's medical team, required immediate and constant care from her mother.

25.     On May 30, 2019, Dr. Stephenson met with her supervisors, Dr. Robert Higgins, then Atrium's Chairman of Obstetrics and Gynecology and the Gynecologic Oncology Division at Atrium, and Dr. Ngina Connors, Division Director of Maternal Fetal Medicine, to communicate her need to take FMLA leave to care for her daughter. Dr.

7

Stephenson informed her supervisors that her daughter's physician recommended treatment that required Dr. Stephenson to take thirty days of continuous FMLA leave beginning June 6, 2019, followed by intermittent FMLA leave for six months.

26.    At this meeting, Dr. Connors was immediately unsupportive of Dr. Stephenson taking FMLA leave. In response to her request for FMLA leave to care for her ill daughter, Dr. Connors openly discouraged her from taking FMLA leave. Dr. Connors even suggested that Dr. Stephenson take a different medical approach than that recommended by her daughter's physician, one that would not require Dr. Stephenson to take any FMLA leave.

27.    Following this conversation, Dr. Stephenson also received text message communication from Dr. Connors inquiring whether she still intended to take FMLA leave. It was evident that Dr. Stephenson was in the position of having to decide between pleasing her bosses in her role as an MFM doctor and fetal surgeon, and providing necessary care for her minor daughter in her role as a single mother.

28.    Despite the intimidation tactics of Drs. Connors and Higgins during and after this meeting, Dr. Stephenson knew that she had no choice but to prioritize her daughter's health. The following day, Dr. Stephenson applied for both continuous FMLA leave to begin June 6, 2019 and end July 6, 2019, and intermittent FMLA leave to begin July 6, 2019, and continue for six months. That day, she also requested guidelines for her FMLA leave, but was not provided any until weeks later. Her leave was granted by Atrium's Human Resources Department ("HR").

8

## Dr. Stephenson's FMLA Leave

29.     As agreed prior to her taking leave, Dr. Stephenson occasionally came to work during her continuous leave, but only when necessary to care for patients who could not be seen by other MFM physicians. For example, when patients were there for fetal surgery consultations or specialized care that no one else in Atrium's MFM division was qualified to perform, Dr. Stephenson made arrangements to see them because it was so critical that these patients receive appropriate care.

30.     Despite all efforts to ensure appropriate patient care, Atrium immediately began retaliating against Dr. Stephenson while she was out on FMLA leave. These retaliatory attacks were particularly troubling because they compromised patient care. For example, in one instance, Defendants forced Dr. Stephenson to abandon a pregnant patient just hours before a vital procedure, against Dr. Stephenson's strong medical advice.

31.     About seven days into Dr. Stephenson's continuous FMLA leave, while she was attending an appointment related to her daughter's medical treatment, Drs. Connors and Higgins messaged Dr. Stephenson and demanded, without explanation, that she come to work for a meeting as soon as possible. Dr. Stephenson complied, and on the night of June 17, 2019, left her daughter to attend the meeting.

32.     Upon arrival at the meeting, Dr. Stephenson was met by Dr. Higgins, who was visibly angry, and Dr. Connors, who appeared cold and stern. Drs. Higgins and Connors told Dr. Stephenson that members of the MFM Department were frustrated by Dr. Stephenson's absence as a result of her FMLA leave, which they described as "unfair."

9

Drs. Higgins and Connors accused Dr. Stephenson of "dumping her responsibilities on her partners" while she took FMLA leave.

33.    During the June 17, 2019 meeting, Drs. Higgins and Connors further reprimanded Dr. Stephenson for not delivering an academic lecture to residents on June 13, 2019 – during her continuous FMLA leave.  Dr. Stephenson offered to compensate for the missed lecture upon returning from FMLA leave, but Drs. Higgins and Connors rebuffed her offer.

34.    During that meeting, for the first time, Drs. Higgins and Connors also accused Dr. Stephenson of providing a patient with substandard care weeks earlier. This allegation was patently false. Dr. Stephenson communicated all the benefits, risks, and ethical concerns to the patient and worked closely with the family and other experts in fetal surgery to devise a safe treatment plan that met the family's goals. The patient's procedure was extremely successful. The surgery's success was made entirely possible by Dr. Stephenson's unique expertise, clinical skill and professionalism.

35.    As a result of this allegation, a "quality action," which is Atrium's internal review process for issues regarding the provision of patient care, was initiated against Dr. Stephenson. Prior to her FMLA leave, Dr. Stephenson had worked more than 15 years at Atrium and had never once received any reprimand regarding patient care or had a quality action initiated against her.

36.    Drs. Higgins and Connors then told Dr. Stephenson that she was "not taking FMLA correctly." Dr. Stephenson was perplexed and sought clarification regarding the problem with her approved FMLA leave. Despite this admonishment, her supervisors

provided no explanation about what she was purportedly doing incorrectly, despite her repeatedly asking for one.

37.     Finally, during the June 17, 2019 meeting, Dr. Stephenson's supervisors imposed new rules regarding any work performed by Dr. Stephenson during her FMLA leave.   Specifically, she was only to schedule emergency patient appointments for Wednesdays and was only to operate on Thursdays.  They also told her that if she came to work *at all* on a given day, she would be required to stay the full day, regardless of whether she had other patients or duties.  She also had to turn in her hours to Ms. Barnhart, which was extremely abnormal for a physician.  This was a very unusual directive to a physician. Even worse, it was required of Dr. Stephenson during her continuous FMLA leave period, when she was entitled to be home caring for her daughter.

38.     On July 8, 2019, Dr. Stephenson returned to work on intermittent FMLA leave. During her intermittent leave – which had been approved by Atrium HR – Dr. Stephenson was not to work on Monday afternoons, so that she could attend important medical appointments with her daughter.

**Retaliatory Actions by Atrium Following Dr. Stephenson's Return to Work**

39.     Almost immediately upon her return from work, Dr. Stephenson began to experience escalating retaliation by Atrium.

40.     In July, Dr. Stephenson was caring for a patient who required a blood transfusion *in utero*.  Due to delays caused by Atrium and the patient's dissatisfaction with Atrium's anesthesiologists, the fetal transfusion was rescheduled by the patient for July 31, 2019, the first day of the 37th week of pregnancy. Fetal transfusions are typically performed

before the 37th week. Dr. Stephenson communicated openly and clearly with the patient about the potential risks and consulted with the neonatal hematologist, who affirmed Dr. Stephenson's plan to perform the transfusion on the first day of the 37th week of pregnancy.

41.     The evening before the scheduled transfusion, Dr. Connors refused to approve the procedure because the patient had already entered her 37th week of pregnancy. Dr. Connors advised Dr. Stephenson that the transfusion could proceed if she received support for the course of care from another MFM doctor. Dr. Stephenson explained that she had consulted closely with an expert in neonatal hematology to determine this course of care. Dr. Connors inexplicably refused to speak with the neonatal hematologist involved, though that neonatal hematologist had reviewed the case and specialized in neonatal hematology.

42.     The morning of the scheduled transfusion, Dr. Stephenson, along with the neonatal hematologist and another MFM doctor, met with the patient. In addition, the neonatal hematologist and other MFM doctor, independent of Dr. Stephenson, presented the options to the patient. The patient, with full information, insisted upon receiving the transfusion and immediately having the baby delivered by cesarean section, a decision all three doctors supported. The fetal transfusion and the delivery were successful and without complication. The baby's father sent Dr. Stephenson a message later that day expressing immense gratitude for the exemplary care she provided to his wife and unborn child.

43.     The next day, on August 1, 2019, Dr. Stephenson was called to meet with Dr. Higgins, Dr. Connors and Jennifer Barnhart, a member of the Atrium administration. During that meeting, Drs. Higgins and Connors falsely accused Dr. Stephenson of

12

performing an "unapproved" procedure – referring to the fetal transfusion. Dr. Stephenson contested the accusations and stated that, in accordance with Dr. Connors's instructions, she had obtained support for the procedure from another MFM doctor and the neonatal hematologist.

44.    Drs. Higgins and Connors then stated that a second quality action would be initiated against Dr. Stephenson. This was the second quality action brought against Dr. Stephenson during her entire career. Both were brought in the summer of 2019, shortly after she requested and took FMLA leave.

45.    Also during the August 1, 2019, meeting, Dr. Stephenson was provided a copy of "2019 minimum work standards" and asked to sign them within 24 hours. Drs. Higgins and Connors told Dr. Stephenson she was out of compliance with these standards because her statistics were late and because she was often late to her office. Both accusations were false.

46.    The next day, August 2, 2019, Dr. Stephenson submitted a detailed explanation of her clinical reasoning, process, and consultations regarding the first quality action. As the chair of the peer review committee in charge of reviewing the case, Dr. Higgins received Dr. Stephenson's letter that same day.

47.    On Sunday, August 4, 2019, Dr. Stephenson was out of town when Dr. Higgins called her and texted her, demanding to speak with her. On Monday, August 5, 2019, Dr. Higgins called her and texted her, insisting that she come to the hospital immediately to meet with him. Dr. Stephenson was flying home that day and was unable

to come to the hospital. In addition, Dr. Stephenson had taken Monday, August 5, 2019, off of work and was also to be on FMLA leave that day.

48.     Dr. Higgins told her that if she did not return that afternoon "there will be consequences."   Due to the gravity of his tone, Dr. Stephenson repeatedly asked Dr. Higgins about the purpose of the meeting. Dr. Higgins advised her that this was a disciplinary meeting for Dr. Stephenson allegedly "abandoning" a patient the previous week – a baseless allegation.

49.     On Tuesday, August 6, 2019, Dr. Stephenson attended the disciplinary meeting with Dr. Higgins, a member of Atrium HR and Jennifer Barnhart, who was part of the Atrium administration.  To attend the meeting, Dr. Stephenson had to cancel an emergent patient pre-operative planning meeting with the parents of a baby who had a chest mass and was at high risk of death without surgical intervention.  Dr. Stephenson told Dr. Higgins about this conflict, but he insisted that she attend the meeting instead of attending to her patient.  This gravely compromised the patient's care.

50.     At the meeting, Dr. Higgins informed Dr. Stephenson that she was immediately being placed on academic leave and her MFM privileges were being suspended.  Three days later, Dr. Stephenson was informed that her hospital privileges were also revoked.

51.     After revoking Dr. Stephenson's privileges, Dr. Higgins ordered her to come to work every day at 8:30 a.m. and stay until 5:30 p.m.  Dr. Stephenson was not allowed to see patients nor was she allowed to view active patient charts.  As a result, Dr. Stephenson

14

spent every day in her office with no ability to work on or provide patient care, which was evident to everyone in the Department. She was humiliated.

## Escalating Disciplinary Measures and Termination

52.     During an August 9, 2019 meeting, Atrium gave Dr. Stephenson a document that would "voluntarily resign" her privileges for six months. She was assured this would be the "best move for her career," and threatened that if she did not voluntarily resign, there could be further consequences. Despite the intimidation, Dr. Stephenson refused to resign her privileges.

53.     On August 15, 2019, Dr. Higgins and Atrium HR called another disciplinary meeting with Dr. Stephenson, where she was given a "final written warning" regarding her "failure to comply with Atrium Health's Minimum Work Standards as well as failure to provide data for fetal care cases in a timely manner following multiple requests for the Chair of OB/GYN." Dr. Higgins also communicated to Dr. Stephenson that any further non-compliance would result in immediate termination.

54.     This paper trail of purported non-compliance was manufactured to create pretext for Dr. Stephenson's termination. For example, the written warning was inexplicably given before Dr. Stephenson's deadline to provide the requested data, which was September 1, 2019. Moreover, Dr. Stephenson had already completed her statistics when she received the written warning.

55.     In addition, it was only during this meeting that Dr. Stephenson was provided, for the first time, a new, revised set of minimum work standards that she had purportedly violated. The revised standards included several new requirements and

15

restrictions designed to personally target Dr. Stephenson and interfere with her ability to provide patient care. Atrium invented new work standards, applied them retroactively, never informed Dr. Stephenson about the changed standards, and then punished her for failing to meet them.

56.     Dr. Higgins and Dr. Connors also created additional attendance requirements targeting Dr. Stephenson, including requiring attendance at trainings and conferences that they knew conflicted with Dr. Stephenson's intermittent FMLA leave schedule. She was also required by Atrium, through Ms. Barnhart, to attend "resiliency training" sessions with an Atrium-contracted psychologist on certain Mondays, the day she was supposed to be out on FMLA leave.

57.     On or around August 20, 2019, Dr. Stephenson's MFM and hospital privileges were restored. Dr. Stephenson never received an explanation regarding why her privileges were restored, including the outcome of any investigation or review that had occurred.

58.     Atrium's retaliation against Dr. Stephenson continued to escalate. On or around September 13, 2019, Dr. Connors sent Dr. Stephenson an email stating that MFM physicians would no longer round on Dr. Stephenson's patients. This sudden change in long-standing practices meant Dr. Stephenson would often be required to work every day of the week to ensure her patients' care was not compromised. This included Mondays, when she was supposed to be on intermittent FMLA leave.

59.     Dr. Stephenson complained to the administration and on September 26, 2019, reported the instances of FMLA interference and retaliation to Dianne Graves and Laura French in Atrium's HR.

60.     On October 8, 2019, the refusal to round on Dr. Stephenson's patients was reversed.

61.     One month later, on November 8, 2019, Dr. Stephenson was unlawfully terminated without cause.

62.     The CFCC, which relied on Dr. Stephenson to carry out its work in providing in utero interventions for life-threatening conditions to patients throughout the Southeast United States, was shut down immediately as a result.

**COUNT I**
**UNLAWFUL INTERFERENCE WITH**
**FAMILY AND MEDICAL LEAVE ACT BENEFITS**
**29 U.S.C. § 2615(a)(1)**
**(Against All Defendants)**

63.     The allegations of paragraphs 1 through 62 are realleged and incorporated by reference as if fully set forth herein.

64.     Defendants are each an "employer" as defined by 29 U.S.C. § 2611(4), as they each employ 50 or more employees for each workday during each of twenty or more calendar weeks.

65.     Dr. Stephenson is an "eligible employee" as defined by 29 U.S.C. § 2611(2), as she has been employed by Defendants for more than 12 consecutive months and during this time period has worked at least 1,250 hours within the 12-month period immediately

preceding her need for leave in June 2019. She had not taken FMLA leave during the 12-month period preceding her request for leave.

66.    Dr. Stephenson's daughter's condition constituted a "serious health condition," as defined by 29 U.S.C. § 2611(11), because it required continuing treatment by a health care provider. Dr. Stephenson was entitled to FMLA leave in order to care for her daughter, pursuant to 29 U.S.C. § 2612(a)(1)(C).

67.    Dr. Stephenson provided appropriate medical notice that her daughter was suffering from a serious health condition and that she would need to take time off work. Dr. Stephenson provided this notice as soon as was practicable.

68.    Dr. Stephenson provided Defendants the certification documents related to her daughter's medical leave, as requested by Atrium.

69.    Pursuant to 29 U.S.C. § 2615(a)(1), Defendants are not permitted "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided" by the FMLA.

70.    Under the FMLA, Dr. Stephenson had a right to take her FMLA leave, not lose any employment benefit as a result of taking leave, and be restored to her previous position of employment, or to an equivalent position, upon her return from such leave. 29 U.S.C. § 2614.

71.    Defendants interfered with Dr. Stephenson's FMLA rights by discouraging her from taking FMLA leave. This placed her in the position of deciding between either upsetting her supervisors or denying her daughter necessary care for her serious medical condition.

72. Defendants further interfered with Dr. Stephenson's FMLA rights by repeatedly interrupting her FMLA leave by requiring her to attend non-emergent meetings. During her continuous leave, Atrium compelled Dr. Stephenson to come to the hospital for meetings with management, required her to remain in the office unnecessarily if her presence had been required at any time that day for emergent patient care, and reprimanded her for missing ancillary work engagements. During her intermittent FMLA leave, Defendants repeatedly required Dr. Stephenson to come into work certain Mondays, the only day of the week she was on leave, refusing to accommodate her approved FMLA leave schedule.

73. Defendants further interfered with Dr. Stephenson's FMLA rights by taking unwarranted disciplinary actions against her, as described herein, during her leave.

74. Defendants further interfered with Dr. Stephenson's FMLA rights by terminating her from employment, on November 8, 2019, four months after her return from continuous FMLA leave and while she was still taking intermittent FMLA leave.

75. Defendants' actions were willful and taken with deliberate disregard for the rights of Dr. Stephenson.

76. As a direct and proximate result of Defendants' wrongful acts and omissions, Dr. Stephenson sustained loss of earnings and earning capacity; incurred loss of medical, fringe and retirement benefits; suffered mental anguish, emotional distress, physical manifestations of distress, humiliation, embarrassment, and damage to her professional reputation and career.

19

77.     Dr. Stephenson should be awarded damages or remedies allowable under the FMLA for Defendants' violations, including, but not limited to, lost wages and benefits, liquidated damages, front pay, pre-judgment and post-judgment interest, attorneys' fees and costs, and an amount equal to the benefits that she would have received had Atrium Defendants not violated the FMLA.

**COUNT II**
**DISCRIMINATION AND RETALIATION FOR REQUESTING AND**
**TAKING LEAVE UNDER THE FAMILY AND MEDICAL LEAVE ACT**
**29 U.S.C. §§ 2611(c)**
**(Against All Defendants)**

78.     The allegations of paragraphs 1 through 77 are realleged and incorporated by reference as if fully set forth herein.

79.     Defendants are each an "employer" as defined by 29 U.S.C. § 2611(4), as they each employ 50 or more employees for each workday during each of twenty or more calendar weeks.

80.     Dr. Stephenson is an "eligible employee" as defined by 29 U.S.C. § 2611(2), as she has been employed by Atrium for more than 12 consecutive months and during this time period has worked at least 1,250 hours within the 12-month period immediately preceding her need for leave in June 2019. She had not taken FMLA leave during the 12-month period preceding her request for leave.

81.     Dr. Stephenson's daughter's condition constituted a "serious health condition," as defined by 29 U.S.C. § 2611(11), because it required continuing treatment

by a health care provider. Dr. Stephenson was entitled to FMLA leave in order to care for her daughter, pursuant to 29 U.S.C. § 2612(a)(1)(C).

82.     Dr. Stephenson first gave Defendants notice of her need for FMLA leave on May 30, 2019. This notification constitutes a protected action under the FMLA.

83.     Dr. Stephenson took continuous FMLA leave from June 6, 2019, to July 6, 2019. Dr. Stephenson took intermittent FMLA leave from July 6, 2019, which was scheduled to run until December 6, 2019. Both of these leaves constitute a protected action under the FMLA.

84.     Pursuant to 29 U.S.C. § 2615(a)(2), Defendants are not permitted "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful" by the FMLA.

85.     Defendants were aware that Dr. Stephenson gave notice of her need for FMLA leave and later took FMLA leave.

86.     In response to Dr. Stephenson's protected activity, Defendants discriminated and retaliated against her by changing the terms and conditions of her employment, including subjecting her to heightened and disparate standards, reprimanding her with little or no basis, requiring her to abide by an unreasonable schedule to which other physicians were not subjected and making false accusations regarding the quality of her patient care and her clinical judgment.

87.     In response to Dr. Stephenson's protected activity, Defendants discriminated and retaliated against her by taking unwarranted disciplinary actions against her, as described herein, during her leave. For example, after 15 years of working at Atrium, only

21

after requesting and taking FMLA leave in 2019 was Dr. Stephenson's medical care submitted for "quality action" review – and two separate cases, with successful outcomes, were then submitted without justification. Dr. Stephenson was unreasonably and unjustly stripped of her hospital privileges.

88.     In response to Dr. Stephenson's protected activity, Defendants discriminated and retaliated against her by terminating her from employment, on November 8, 2019, four months after her return from continuous FMLA leave and while she was still taking intermittent FMLA leave.

89.     There is a causal connection between Dr. Stephenson's protected activity and each of these actions, including her termination from Atrium.

90.     Atrium's actions were willful and taken with deliberate disregard for the rights of Dr. Stephenson.

91.     As a direct and proximate result of Atrium's wrongful acts and omissions, Dr. Stephenson sustained loss of earnings and earning capacity; incurred loss of medical, fringe and retirement benefits; suffered mental anguish, physical injury, emotional distress, humiliation, embarrassment and damage to her professional reputation and career.

92.     Dr. Stephenson should be awarded damages or remedies allowable under the FMLA for Defendants' violations, including, but not limited to, lost wages and benefits, liquidated damages, front pay, pre-judgment and post-judgment interest, attorneys' fees and costs, and an amount equal to the benefits that she would have received had Defendants not violated the FMLA.

**COUNT III**

## BREACH OF CONTRACT
### (Against All Defendants)

93.     The allegations of paragraphs 1 through 92 are realleged and incorporated by reference as if fully set forth herein.

94.     On June 20, 2017, Dr. Stephenson entered into an employment agreement with Defendants, which had a one-year term and renewed automatically every year until termination (the "Employment Agreement"). The Employment Agreement renewed on June 20, 2019.

95.     The Employment Agreement is a legal and enforceable contract between Defendants and Dr. Stephenson.

96.     Under the terms of the Employment Agreement, the Defendants agreed to "provide the facilities, equipment, support, personnel and supplies that are reasonably necessary for [Dr. Stephenson] to provide medical services."

97.     Defendants breached their duties to Dr. Stephenson pursuant to the Employment Agreement in a number of ways described herein, including but not limited to, by:

      a.   Failing to provide the proper facilities, equipment and supplies reasonably necessary for Dr. Stephenson to administer medical care to her patients, including stripping her of her privileges;

      b.   Failing to provide support reasonably necessary for Dr. Stephenson to administer medical care to her patients, as repeatedly indicated by the denial

of privileges, disapproval of medically appropriate treatment and taking disciplinary actions against her for medically proper treatments;

c.  Failing to provide personnel reasonably necessary for Dr. Stephenson to administer medical care to her patients, including refusals by other MFM physicians to round on Dr. Stephenson's patients;

d.  Failing to provide facilities, equipment, support, personnel and supplies reasonably necessary for Dr. Stephenson to administer medical care to her patients when they wrongfully terminated her and closed the CFCC.

98.  Atrium's actions were willful and taken with deliberate disregard for the rights of Dr. Stephenson. Further, Atrium's actions severely compromised patient care which, in many cases, was emergent and life-threatening to the babies in utero.

99.  As a direct and proximate result of Atrium's unlawful conduct, Dr. Stephenson sustained loss of earnings and earning capacity; incurred loss of medical, fringe and retirement benefits; suffered mental anguish, physical injury, emotional distress, humiliation, embarrassment and damage to her professional reputation and career.

100.  Dr. Stephenson should be awarded damages or remedies for Atrium's violations including, but not limited to, lost wages and benefits and compensatory damages.

**COUNT IV**
**BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**
**(Against All Defendants)**

101.  The allegations of paragraphs 1 through 100 are realleged and incorporated by reference as if fully set forth herein.

102.    Implicit in all contracts is a covenant of good faith and fair dealing in the course of contract performance. The covenant protects the parties' reasonable expectations as well as their right to receive the benefits of their agreement.

103.    Defendants breached the implied covenant of good faith and fair dealing in carrying out their obligations under Dr. Stephenson's Employment Agreement through the conduct alleged herein.

104.    Defendants breached the implied covenant of good faith and fair dealing by interfering with Dr. Stephenson's federally-protected right to take family leave. Defendants further breached the implied covenant of good faith and fair dealing by retaliating and discriminating against Dr. Stephenson for requesting and taking federally-protected family leave.

105.    It was reasonable for Dr. Stephenson to expect that she would be permitted to continue in her employment without experiencing interference, retaliation or discrimination for exercising her federally-protected rights.

106.    Defendants breached the implied covenant of good faith and fair dealing by making it almost impossible to adequately perform her duties, investigating and disciplining her for sound medical decision-making, humiliating her at work and stripping her of her privileges. It was reasonable for Dr. Stephenson to expect that she would be provided an environment where she was treated appropriately and that she would not unreasonably be denied access to MFM and hospital facilities.

107.    Defendants breached the implied covenant of good faith and fair dealing by terminating Dr. Stephenson and making it impossible to provide necessary care for her

patients, particularly with respect to fetal surgery patients who could no longer access interventional fetal surgery options anywhere in the Southeast.

108.  Defendants acted unfairly and in bad faith to prevent Dr. Stephenson from receiving the benefits provided under the Employment Agreement.

109.  Defendants' actions were willful and taken in deliberate disregard for the rights of Dr. Stephenson.

110.  As a direct and proximate result of Defendants' unlawful conduct, Dr. Stephenson sustained loss of earnings and earning capacity; incurred loss of medical, fringe and retirement benefits; suffered mental anguish, physical injury, emotional distress, humiliation, embarrassment and damage to her professional reputation and career.

111.  Dr. Stephenson should be awarded damages or remedies for Defendants' violations, including, but not limited to, lost wages and benefits and compensatory damages.

## COUNT V
## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

112.  The allegations of paragraphs 1 through 111 are realleged and incorporated by reference as if fully set forth herein.

113.  Defendants were each under a duty to use ordinary care to protect others, including Dr. Stephenson, from injury.

114.  Defendants were negligent in that they:

a.  Failed to exercise ordinary care to protect others, specifically Dr. Stephenson, from harm;

b.  Knew or should have known that their conduct, including their retaliatory treatment and professional humiliation of Dr. Stephenson, was likely to cause Dr. Stephenson severe emotional distress;

c.  Continued their course of conduct, despite knowing that it would cause Dr. Stephenson severe emotional distress;

d.  Did not adequately discipline, train or otherwise stop the improper conduct of Dr. Higgins, Dr. Connors or Ms. Barnhart;

e.  Effectively ratified the behavior of Dr. Higgins, Dr. Connors or Ms. Barnhart; and

f.  Were otherwise negligent as described herein.

115.  Defendants are also liable pursuant to *respondeat superior* for the negligent conduct of Dr. Higgins, Dr. Connors or Ms. Barnhart, which includes that they each:

a.  Failed to exercise ordinary care to protect others, specifically Dr. Stephenson, from harm;

b.  Knew or should have known that their repeated harassment, retaliatory actions, false accusations and open humiliation of Dr. Stephenson would cause her severe emotional distress;

c.  Continued their conduct, despite knowing that it would cause Dr. Stephenson severe emotional distress; and

d.  Were otherwise negligent as described herein.

116.  Due to this conduct, Dr. Stephenson has suffered severe emotional distress.

117.    As a direct and proximate result of Defendants' negligence, Dr. Stephenson has suffered, and continues to suffer, severe emotional distress, including anxiety, embarrassment, loss of career, damage to reputation and career, feelings of helplessness and hopelessness, suffering, mental anguish and loss of enjoyment of life, as well as medical expenses.

118.    Dr. Stephenson is entitled to recover all damages available under the law, including compensatory and economic damages in an amount to be determined by a jury.

119.    Due to the severity of Defendants' misconduct, Dr. Stephenson is also entitled to punitive damages in an amount to be determined by a jury.

## COUNT VI
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

120.    The allegations of paragraphs 1 through 119 are realleged and incorporated by reference as if fully set forth herein.

121.    Defendants each engaged in extreme and outrageous conduct by harassing, humiliating, degrading, falsely accusing and terminating Dr. Stephenson as described herein.

122.    Defendants knew or should have known that severe emotional distress would likely result from their conduct.  Defendants' conduct was recklessly indifferent to the likelihood that it would cause Dr. Stephenson severe emotional distress.

123.    Defendants' conduct did, in fact, cause Dr. Stephenson severe emotional distress.

124.   As a direct and proximate result of Defendants' negligence, Dr. Stephenson has suffered, and continues to suffer, severe emotional distress, including anxiety, embarrassment, loss of career, damage to reputation and career, feelings of helplessness and hopelessness, suffering, mental anguish and loss of enjoyment of life, as well as medical expenses.

125.   Dr. Stephenson is entitled to recover all damages available under the law, including compensatory and economic damages in an amount to be determined by a jury.

126.   Due to the severity of Defendants' misconduct, Dr. Stephenson is also entitled to punitive damages in an amount to be determined by a jury.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff Courtney Stephenson requests that this Court enter judgment in her favor and against Defendants Carolinas Physicians Network, Inc., Atrium Health, Inc., and The Charlotte-Mecklenburg Hospital Authority, jointly and severally, and further:

(a)   Award Dr. Stephenson compensatory damages to be determined by a jury, plus demonstrated past and future pecuniary damages on each of the above-stated counts; and

(b)   Award Dr. Stephenson punitive and exemplary damages, in an amount to be determined by a jury, on each of the above-stated counts; and

(c)   Award Dr. Stephenson appropriate front pay and back pay, including all lost income and benefits of employment both past and future; and

(d)   Award Dr. Stephenson attorneys' fees and costs of this action;

(e)    Tax the prejudgment interest of the damages, attorneys' fees and costs of this action to the Defendants, as of the date of the filing of this Complaint; and

(e)    Award Dr. Stephenson such other and further relief as may be appropriate.

## **JURY DEMAND**

Plaintiff Courtney D. Stephenson hereby demands a trial by jury with respect to each claim in this Complaint.

This the 11th day of March, 2021.

Respectfully submitted,

/s/ Catharine E. Edwards
Catharine E. Edwards
NC Bar No. 52705
cedwards@edwardskirby.com
**EDWARDS KIRBY, LLP**
3201 Glenwood Ave., Suite 100
Raleigh, NC 27612
Telephone: (919) 780-5400
Facsimile:  (919) 800-3099

/s/ Mary Kathryn Kurth
Mary Kathryn Kurth
N.C. Bar No.:  49461
mkurth@edwardskirby.com
**EDWARDS KIRBY, LLP**
3201 Glenwood Ave., Suite 100
Raleigh, NC 27612
Telephone: (919) 780-5400
Facsimile:  (919) 800-3099

/s/ Andrew C. Avram
Andrew C. Avram
N.C. Bar No.:  51106
aavram@edwardskirby.com
**EDWARDS KIRBY, LLP**
3201 Glenwood Ave., Suite 100

30

Raleigh, NC 27612
Telephone: (919) 780-5400
Facsimile:  (919) 800-3099

***Counsel for Plaintiff Courtney Stephenson***